UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHELSIE JOHNS,<br><br>     Plaintiff,<br><br>v.<br><br>GENEFER HARVEY, DANIEL MANIER,<br>SANDRA HALE, ALEECE VEIT, *in their*<br>*individual and official capacities*,<br><br>     Defendants. | Case No. 15-12924<br>Honorable Laurie J. Michelson<br>Magistrate Judge Anthony P. Patti |

**OPINION AND ORDER**
**DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [33]**

In the summer of 2013, Chelsie Johns went to the DTE Music Theater in Independence Township, Michigan to see a concert with a few of her friends. DTE security stopped her at the gate because she appeared to be intoxicated. Johns refused to go to first aid and security called the Oakland County Sheriff Department. A subsequent encounter between Johns and two deputies resulted in Johns falling down face-first, breaking her two front teeth. After she was arrested and brought to the jail, Johns alleges that deputies tore off her clothing during a strip search in view of male deputies.

Johns brings this § 1983 case challenging the deputies' use of force at the concert venue and the strip search at the jail. A prior opinion dismissed all defendants except for the arresting deputies Harvey and Manier, and the strip search deputies Hale and Veit. Harvey and Manier move for summary judgment asserting that the *Heck* doctrine bars Johns' claims and that they are entitled to qualified immunity. Hale and Veit seek summary judgment claiming that the evidence does not

reveal each deputy's specific conduct during the strip search and that a video at the station proves that the incident did not occur in the manner Johns alleges.

Because there are genuine issues of material fact on the remaining claims, the Court denies Defendants' motion for summary judgment.

## I.

On August 14, 2013, Johns and a couple of her friends went to the DTE Music Theater in Independence Township, Michigan to attend an all-day concert. (R. 33, PID 387; R. 37, PID 585.) As the weather was warm that day, Johns wore shorts and a short-sleeved shirt. (R. 33-1, PID 427.) At the time, Johns was in her earlies twenties, stood about 5'4" and weighed around 110 pounds. (R. 33-1, PID 416, 437, 445.) A few weeks before the concert, Johns had surgery on her right ankle. (R. 33-1, PID 427.) Johns, a certified nursing assistant, and her mother, a registered nurse, had removed the stitches and Johns wore an air cast. (*Id.*) Johns took Vicodin for the pain prior to leaving for the concert. (R. 33-1, PID 427–28.) She also took her crutches, but left them in the car. (R. 33-1, PID 428.)

Johns and her friends parked in the lot surrounding the concert venue and Johns had one alcoholic drink. (R. 33-1, PID 428.) After tailgating for less than an hour, her friends started to enter the concert venue. (*Id.*) But Johns had to retrieve something from the car, so she told her friends to go ahead. (*Id.*) When she eventually arrived at the gate, event security denied her entry because they said she was too intoxicated. (*Id.*) Johns tried to explain that her unsteady gait was due to her recent ankle surgery. (R. 33-1, PID 429.) Johns concedes that she argued with DTE security because she disagreed that she was intoxicated. (*Id.*) DTE security asked Johns to go to the first aid station, but she refused, telling them that she is a certified nursing assistant and that she did not want medical treatment. (R. 33-1, PID 430–31.)

2

At this point, there are material differences between Johns' account of events and the accounts of the deputies. The Court will recount both parties' versions, recognizing that it has to view the facts in the light most favorable to Johns.

First, the Defendants' version. Oakland County Sheriff Department Deputy Genefer Harvey was on overtime detail at DTE the day of the concert. (R. 37-7, PID 708.) DTE Security called her and her partner, Deputy Daniel Manier, to go to the parking lot because a highly intoxicated female was refusing to go to first aid. (R. 37-7, PID 709.) When Harvey and Manier arrived, they found Johns sitting in a puddle of an unknown substance. (R. 37-7, PID 710.) Harvey thought Johns was intoxicated because of her slurred speech and body movements. (R. 37-7, PID 711.) Johns refused to go to the first aid station when asked, so Harvey and Manier lifted her up, placed her into a wheelchair, and wheeled her to first aid. (R. 37-7, PID 712–14.) Johns was swearing the entire time. (R. 37-7, PID 712.) The deputies would have let Johns go if she had a friend to take her home, but none were sober enough to do so. (R. 37-7, PID 713–14.) Harvey did not believe Johns was in a condition to be left in the parking lot by herself. (R. 37-7, PID 711–12.)

Due to John's behavior, the doctor at the first aid station asked Harvey and Manier to get Johns "out of here" because "he wasn't dealing with her." (R. 37-7, PID 714.) A friend of Johns, who was with her at the time, wanted to go into the venue, but could not because Johns had his cell phone and credit card. (R. 37-7, PID 714–15.) Harvey thus asked Johns for the cell phone and credit card. (*Id.*) Johns "told her to fuck off." (*Id.*) Harvey then leaned Johns forward in her wheelchair to check for the phone and credit card and Johns slapped her arm. (*Id.*) Harvey and Manier then stood Johns up and handcuffed her against a wall. (R. 37-7, PID 715.)

As they walked her toward the sheriff's trailer, Johns began to pull away. (R. 37-7, PID 716.) Harvey tried to pat her down. (*Id.*) Then Johns "began to kick." (*Id.*) She kicked Manier in

3

the thigh with her left foot. (*Id.*) Johns then went to kick Harvey with her right foot and Harvey pulled her to the ground, attempting to pull her to the knees in order to "prone [her] out." (*Id.*) Instead, Johns fell on her face. (*Id.*) Once on the ground, Harvey put one hand on Johns' back and one on her shoulder, and Manier held down her legs. (R. 37-7, PID 717.)

Other deputies arrived with a patrol car, and they picked Johns up—while she argued and "wiggl[ed]"—and put her in the car. (R. 37-7, PID 717.) Harvey reported that the transporting deputy told her they called the jail in transit because Johns was trying to kick the windows out of the car and asked that the cell extraction team be in place when they arrived. (R. 37-7, PID 717–18.) The extraction team included both men and women. (R. 37-7, PID 718.)

Oakland County Sheriff Deputies Hale and Veit were on duty the afternoon Johns arrived. They acknowledge their signatures on an Authorization for Strip Search form, naming them as the people authorized to conduct and/or assist in strip searching Johns. (R. 41; R. 37-5, PID 682–83; R. 37-6, PID 702.) Hale stated that forms are sometimes filled out in advance, even if a strip search is never conducted (R. 37-5, PID 691–92), but Veit testified that she would only sign the form after a search was done (R. 37-6, PID 702). Hale testified that strip searches of women are always conducted in the women's annex and either take place in the strip search room, or, if the person is combative, in the detoxification unit (DTU) room. (R. 37-5, PID 688.) The DTU room has windows. (*Id.*) Neither Hale nor Veit have any present memory of whether or not they strip searched Johns. (R. 37-5, PID 682–83; R. 37-6, PID 699.)

Johns has a different account of the events.

Like DTE security, deputies Harvey and Manier also asked Johns to go to the first aid station, and after she again refused, they told her that she could either go to the first aid station or be arrested. (R. 33-1, PID 430.) Harvey and Manier then escorted her to the first aid station. (R.

4

33-1, PID 430.) Johns refused medical treatment. (*Id.*) While she did not get belligerent—and denies ever slapping Harvey—she admits that she got "irritated, aggravated and may have raised her voice." (R. 33-1, PID 430–31.) Harvey and Manier then started to escort her away from the first aid station. (R. 33-1, PID 432.)

After one of the deputies said something that "sent [her] over the edge," Johns "was like, you know what, dude, fuck you." (R. 33-1, PID 432.) After that, Johns recounts that one of the deputies "literally hip-tossed her face first on the pavement" causing her to fall on her face and break her two front teeth in half. (*Id.*) Once on the ground, the same deputy "shoved his knee into [her] neck and then handcuffed [her]." (*Id.*) After seeing her teeth on the ground, she "lost it" and called the deputies "probably every name in the book." (R. 33-1, PID 433.) She denies kicking the deputies and says it "would have been physically impossible" given the condition of her ankle. (R. 33-1, PID 432.) A different deputy arrived to take her to the county jail. (*Id.*)

During the ride, Johns "bawl[ed] [her] eyes out." (R. 33-1, PID 433.) A group of male and female deputies were waiting for her in the station's sally port when she arrived and pulled her out of the car. (R. 33-1, PID 435–36.) Shortly after being pulled from the car, one or more deputies began "ripping" off her clothing while the surrounding group of deputies laughed. (R. 33-1, PID 436.) While removing her clothing, the deputies broke her bra, broke the zipper on her shorts, and ripped her shirt. (R. 33-1, PID 435–36.) All of her clothing was removed. (R. 33-1, PID 437.) Deputies then "threw" a pair of grey, inmate clothing at her and Johns was allowed to dress herself. (R. 33-1, PID 436–37.) Johns is "pretty sure" that male deputies were present the entire time. (R. 33-1, PID 437.) Because she was faced down, Johns is not sure where the strip search took place, but she believes it happened in a larger space and occurred somewhere close to the car soon after

5

she was removed. (R. 33-1, PID 436.) Johns eventually pled guilty to drunk and disorderly conduct, as well as attempted resisting or obstructing a police officer. (R. 33-1, PID 440; R. 33-3, PID 480.)

**II.**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

**III.**

Harvey and Manier argue that Johns' excessive-force claim should be dismissed for two reasons: because they are entitled to qualified immunity and because *Heck v. Humphrey* bars relief. The Court denied the *Heck* argument in its oral ruling on January 25, 2018. Thus, it will now address the qualified immunity argument.

Qualified immunity shields government officials performing discretionary functions from suit under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants are entitled to qualified immunity if "(1) they did not violate any of [plaintiff's] constitutional rights or (2) the violated rights, if any, were not 'clearly established' at the time of the alleged misconduct." *Ruffin v. Cuyahoga County, OH*, --- F. App'x ---, 2018 WL 343564, at *1 (6th Cir. Jan. 10, 2018) (citing *Pearson v. Callahan*, 555 U.S. 223,

232 (2009)). Once qualified immunity is raised, the plaintiff must establish that defendants are not entitled to it. *Id.* (citing *Kennedy v. City of Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010)).

The Court will start with the first prong. The Fourth Amendment of the United States Constitution protects a person from being subjected to excessive physical force during the course of an arrest, a booking, or other police seizure. *Phelps v. Coy*, 286 F.3d 295, 299-300 (6th Cir. 2002). When analyzing excessive force claims, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation omitted). And whether the force used during a seizure is objectively reasonable "depends on the totality of the circumstances, including 1) the severity of the crime, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This list of factors is not exhaustive, and, ultimately, the question is whether the seizure was reasonable given the totality of the circumstances. *Id.*

Taking the facts in the light most favorable to Johns, a reasonable jury could find the deputies' actions unreasonable. The Defendant deputies were responding to an intoxicated concert-goer in a parking lot who was refusing to go to a first-aid station. This is not a severe or violent crime "that would support a greater use of force." *Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006); *see also Malory v. Whiting*, 489 F. App'x 78, 83 (6th Cir. 2012). The individual was a young female, wearing an air cast, who only weighed 110 pounds. While she yelled and cursed at the deputies, she was not armed and says she did not act in an aggressive or threatening manner. (*See* R. 33-1); *cf. Goodrich v. Everett*, 193 F. App'x 551, 555–56 (6th Cir. 2006) (finding, where

7

plaintiff was suspected of aggravated domestic assault and drove away from five law-enforcement vehicles and evaded two police roadblocks, that officers could reasonably fear that the plaintiff might act violently toward them). Deputy Harvey's own testimony does not suggest otherwise. (*See* R. 33-6.) Additionally, Johns did not actively resist the deputies. (*See* R. 33-1); *see Lustig*, 211 F. App'x at 370 (plaintiff "offered at most passive resistance" when she was argumentative and yelled at officers). Thus, at least under Johns' account, Defendants were responding to a minor disturbance and came upon a small woman who did not resist the deputies and at most swore and yelled at them.

Now consider the force used in response to that non-threatening situation. Under Johns' account, after she told the deputy to "fuck off," the deputy threw her to the ground face first and pressed his knee on her back.[1] (R. 33-1, PID 432.) As a result, Johns' two front teeth broke in half. (*Id.*; R. 33-2) Thus, even if some force was justified, a factfinder could conclude that throwing Johns to the ground face first and pinning her down with a knee was "gratuitously applied additional force, which inflicted pain . . . against an individual who posed no threat to safety, did not attempt to flee, offered at most passive resistance to the officers, and was already under the officer['s] physical control." *Lustig*, 211 F. App'x at 371; *see also Malory*, 489 F.App'x at 84 (finding that officer who slammed person to ground and pinned his head down with his knee was not objectively reasonable when the person was only argumentative). Here, drawing all reasonable inferences in Johns' favor, a reasonable jury could find the deputy's actions unreasonable.

Looking next to the second prong, Johns' right to be free from being thrown down face first after, at most, passively resisting an arrest for drunk and disorderly conduct was clearly

---

[1] Defendants argued that Johns was judicially estopped from relying on her account because of her plea. The Court dismissed this argument in its oral ruling on January 25, 2018.

established at the time of the incident. "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Supreme Court recently clarified that the principle "should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, a plaintiff "must identify a case with facts so similar that the individual defendants would have had a clear warning of what the law requires." *Ruffin*, 2018 WL 343564, at *2 (citing *White*, 137 S. Ct. at 552).

Johns asserts that Sixth Circuit case law establishes that "taking a person to the ground constitutes excessive force when the person in question 'did not pose a tenable threat to the officers' safety.'" (R. 37, PID 604 (citing *Lyons v. City of Xenia*, 417 F.3d 565, 578 (6th Cir. 2005).) The Court agrees that the controlling law gave notice to deputies that Johns' passive resistance did not warrant the amount of force used. *See Malory*, 489 F. App'x at 86; *Lustig*, 211 F. App'x at 371.

*Malory* is factually quite similar to this case. 489 F. App'x 78. Malory was brought into the station for driving without a license and running a red light. *Id.* at 79. He argued with the booking officer. *Id.* at 80. So the booking officer shoved Malory's head into the booking counter and pulled his legs out from under him. *Id.* Once on the ground, the officer drove his knee into Malory's right temple. *Id.* The Sixth Circuit explained: "In light of [Malory's] conduct, reasonable officers would have understood that an *obvious legal norm prohibited them from tackling a suspect who made only a mild show of resistance,* pressing his head into the ground, and punching him." *Id.* at 86 (emphasis added). The Court further found that the fact that the force was used prior to someone being handcuffed is not a "decisive consideration" in determining whether the freedom

9

from excessive force was clearly established. *Malory*, 489 F. App'x at 85 (citing *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009)).

Although *Malory* is an unpublished decision, the analysis in *Malory* is founded on a long-established Sixth Circuit principle that "people who pose no safety risk to the police [have a right] to be free from gratuitous violence during arrest." *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 608 (6th Cir. 2006) (finding that right to be free from being struck by officer's baton when the person evaded but did not actively resist arrest was clearly established) (internal quotation omitted). Indeed, *Baker* supported this principle by citing *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006); *Phelps v. Coy*, 286 F.3d 295, 301–02; *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994); and *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988). *Id.* Because Johns, under her account, posed no safety risk, Manier and Harvey had clear warning that they were prohibited from using gratuitous violence. In other words, as being struck with a baton (*Baker*, 471 F.3d at 609), punched in the face (*Phelps*, 286 F.3d at 302), struck or jumped on (*Shreve*, 453 F.3d at 688), and sprayed with mace (*Adams*, 31 F.3d at 386) have all been found to be gratuitous violence, the deputies were on notice that throwing Johns to the ground face-first and holding her down with a knee for her verbal assaults would be, too. The deputies are therefore not entitled to qualified immunity as a matter of law.[2]

---

[2] The cases Defendants cite present drastically different facts. In *Goodrich v. Everett*, 193 F. App'x 551 (6th Cir. 2006), officers responded to a suspected instance of domestic violence where the plaintiff refused to get out of his car when asked and instead drove away, refusing to pull over his car despite officers' orders. He evaded two police roadblocks, and drove in the front yard of someone's home. *Goodrich* is not a case of passive resistance where the plaintiff presented no threat. In *Caie v. West Bloomingfield Township*, 485 F. App'x 92 (6th Cir. 2012), the plaintiff was suicidal and stated aloud whether he should fight the officers to give them a reason to kill him, and acted in a violent, hostile and threatening manner.

**IV.**

Hale and Veit argue that Johns' unreasonable-search claim based on the strip search should be dismissed for two reasons. For one, they say that the claim fails because the evidence does not show which of them conducted the unlawful search. (R. 33, PID 407.) For another, they argue that a video recording shows that the strip search did not happen the way Johns said it did. (R. 33, PID 409–11.) Again, genuine issues of material fact preclude summary judgment.[3]

**1.**

"Damages claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Lanham v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008). The Court will therefore not "ascribe the acts of all individual defendants to each individual defendant." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011).

Veit and Hale's argument relies on the above law and Johns' testimony. During her deposition, Johns conceded she could not identify the deputies who conducted the strip search. (R. 33-1, PID 437.) She could recall that more than one person could have conducted the search, that her clothing was torn off, and was "pretty sure" that men were present for the search. (R. 33-1, PID 436–37.)

The problem with Viet and Hale's argument is that the record contains more than just Johns' testimony. Johns has provided an "Authorization for Strip Search" form, which includes

---

[3] In ruling on Defendants' motion to dismiss, the Court framed Plaintiff's issue as "the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013) (quoting *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir.2002)). (R. 21.) Defendants' motion for summary judgment does not challenge this.

her name written in as the person being searched, the date, time, and location of the search, and the names and signatures of Veit and Hale, specifically identifying them as the deputies who were authorized to conduct and assist in conducting Johns' strip search. (R. 41.) Veit also testified that she would only sign the form after a search was conducted. (R. 37-6, PID 702.) Hale testified that if a search was done that afternoon, she would have been the one who would have performed that search or assisted in that search. (R. 37-5, PID 686). And Hale testified that it is department policy that the deputy who is going to perform the search signs the form and she signed the form. (R. 37-5, PID 685.) Further, Hale and Veit offer no affirmative testimony to refute Johns' testimony—indeed, Veit and Hale testify that they cannot remember one way or the other whether they strip searched Johns. (R. 37-5, PID 683; R. 37-6, PID 699.) Through the authorization form, Johns' testimony, and Veit and Hale's testimony, Johns presents evidence upon which a reasonable jury could find that Veit and Hale both conducted the strip search, did so in the presence of men, and did so by tearing off her clothing. This is enough to survive summary judgment. *Cf. Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015); *Lanham*, 529 F.3d 673 at 677–79.

## 2.

Lastly, Hale and Veit argue that a video recording from within the jail is "uncontroverted proof" that a strip search did not happen the way Johns said it did, and therefore her claim must be dismissed. (R. 33, PID 409.)

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). But "[w]here plaintiff's testimony is only partially contradicted by audio and video recording, 'that does not permit the district court to discredit [plaintiff's] entire version of the

12

events.'" *Toner v. Village of Elkton*, 547 F. App'x 720, 724 (quoting *Coble v. City of White House*, 634 F.3d 865, 869 (6th Cir. 2011)). Indeed, "[f]acts that are not blatantly contradicted by [a video] recording remain entitled to an interpretation most favorable to the non-moving party." *Coble*, 634 F.3d at 870.

Hale and Viet's claim that the video blatantly contradicts Johns' testimony has some merit. Johns gave the following testimony regarding the timing and location of the strip search:

> Q. [W]hen you arrived in the garage [the Cell Extraction Team was] there waiting to get you from the patrol car?
>
> A. As far as I know, yeah. When I got out they just -- like when I got there they literally like ripped me out of the car. . . . .
>
> Q. So they took you out of the car. Let's go step-by-step with this. Then what happened?
>
> A. They ripped my clothes off of me.
>
> Q. So you step right out of the car and all your clothes are ripped off?
>
> A. (Shaking head negatively).
>
> Q. Okay.
>
> A. They pulled me out of the car.
>
> Q. Okay.
>
> A. I was on the ground, because I couldn't -- I mean, I couldn't walk because my ankle. I was in handcuffs. I was on the ground, they were in a group around me just laughing. They ripped my clothes off of me, to the point I broke my bra strap, like I said, ripped my shirt, broke my zipper on my shorts. I had never been in a situation like that, so I'm just bawling my eyes out. And they're all laughing, and they threw a pair of gray inmate clothing at me and made me put that on.
>
> Q. So where -- did this happen in the garage? Where did this happen?
>
> A. I'm not sure. Because -- it literally happened so fast they ripped me out of the car. I don't know how far they brought me. If it was in the garage or in the jail. And I didn't go far though from the car, so it was either in the garage or right inside. It

13

was somewhere close to the car. Because it's not like they transported me, you know.

Q. Well, the garage is pretty big and cells pretty small. So was it like a bigger space or a smaller space?

A. I think it was a bigger space. Because like I said, I wasn't in a cell. They had -- I remember them bringing me to an isolation cell. So it was right after they pulled me out of the car.

*  *  *

Q. All right. So you get out of the car, you're in the garage. Was it like 30 seconds, 10 seconds? How much goes by before your clothes are ripped off?

A. I don't -- it wasn't long. I couldn't tell you exactly. It was -- I didn't make it far out of the car, I know that.

Q. More or less than five seconds?

A. It was probably more than five seconds.

Q. More or less than 10 seconds?

A: I don't know. It happened so fast, you know, so –

Q. Is it fair to say that it happened in less than 30 seconds from the time you got taken out of that patrol car?

A. Probably somewhere around there, less than a minute, I know that. Like I said, I didn't make it far. I just don't know where exactly I was. I'm not familiar with the –

(R. 33-1, PID 436.)

The video shows Johns surrounded by a fairly large group of male and female deputies who lead her from the sally port through the booking room and into another room off-camera (presumably the women's annex). (R. 35.) This takes about a minute and a half. (R. 35 (19:19:34 to 19:21:09).) Johns is clothed—she is wearing a shirt and shorts. (*Id.*) Thus, the video shows that Johns was not strip searched in the sally port immediately after being removed from the car.

14

Even so, the Court cannot find that the video "blatantly contradicts" John's version of events. (R. 37, PID 606–07.) The video does not show what happens after the group of deputies took her into the women's annex. And Johns ultimately testified that she was not entirely sure where the search took place. (R. 33-1, PID 436–37.) She also testified that the search could have taken place as long as a minute after she was removed from the car. (*Id*.) This is relatively close to the amount of time shown on the video. Because of Johns' qualifications as to when the search could have taken place, the video does not "blatantly contradict" her account. And to the extent Johns was mistaken about the exact time and location of the search, this is a credibility issue for the jury.

* * *

The Court will deny Defendants' motion with respect to Johns' unreasonable-search claim (Count II).

V.

For the reasons stated, the Court will DENY Defendants' Motion for Summary Judgment.

SO ORDERED.

                                                    s/Laurie J. Michelson
                                                   LAURIE J. MICHELSON
Dated: February 1, 2018               U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 1, 2018.

                                                    s/Keisha Jackson
                                                    Case Manager